UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GOTION, INC.,

     Plaintiff,

v.

     Case No. 1:24-cv-275

GREEN CHARTER TOWNSHIP,

     HON. JANE M. BECKERING

     Defendant.

_____/

## OPINION AND ORDER

Since 2022, Plaintiff Gotion Inc. ("Gotion") has been engaged in the planning and construction of a new battery component manufacturing site and industrial park in Mecosta County, Michigan.  In March 2024, Gotion initiated this diversity case against Defendant Green Charter Township ("the Township"), alleging that the Township was in breach of an August 22, 2023 Development Agreement.  Gotion accompanied its Complaint with a Motion for a Preliminary Injunction (ECF No. 2), which the parties have since fully briefed.  This Opinion contains the Court's findings of fact and conclusions of law in accordance with the specificity requirement of FED. R. CIV. P. 65(d).  For the following reasons, the Court determines, in its discretion, that the overall balancing of the equities warrants the issuance of a Preliminary Injunction during the pendency of this case, or until further Order of the Court.  The Court therefore grants Gotion's motion.

## I.  BACKGROUND

### A.  Findings of Fact[1]

**1.   The Parties**

Gotion is a subsidiary of Gotion High-Tech Co., which Gotion alleges is "one of the world's largest electric vehicle ('EV') battery manufacturers and has been named on Bloomberg's list of top 25 new energy producers" (Compl. [ECF No. 1] ¶ 13).  Gotion's Vice President of North American Manufacturing, Chuck Thelen, represents that Gotion has a nationwide initiative to establish an EV battery supply chain in the United States (Thelen Decl. [ECF No. 3-1] ¶¶ 1 & 3).

The Township, which is located in Mecosta County, Michigan, is governed by a seven-member Township Board composed of a supervisor, clerk, treasurer, and four trustees (ECF No. 13-1 at PageID.238).  *See generally* MICH. CONST. Art. 7, § 18 (Township officers).

**2.   Michigan's 2022 Tax Incentives & Public Grants**

In September 2022, Mecosta County, Big Rapids Township, and the Township approved the designation of a 30-year Renaissance Zone tax abatement to attract Gotion and the construction of a new battery component manufacturing site and industrial park in Mecosta County, Michigan (the "Project") (Compl. ¶ 35; Thelen Decl. ¶ 2).  Gotion alleges that once completed, the Project will annually produce up to 400,000 tons of cathode material, a critical component of lithium-ion batteries used in electric and hybrid vehicles (Compl. ¶ 15).  The designation will provide the Project with an estimated tax-incentive package of $540 million (*id.* ¶ 36).

---

[1] Both sides heavily rely in their motion papers on the factual allegations that Gotion makes in its Complaint, as well as the numerous documents Gotion attached to its Complaint.  The Court has likewise referenced in these Findings of Fact not only the supporting documents but also many of the factual allegations.  Although factual allegations are not evidence, the allegations are largely undisputed.  As noted herein, the motion at bar turns on the legal import of the events in this case rather than any meaningful dispute about the events themselves.

On September 29, 2022, Gotion submitted to the Michigan Economic Development Corporation ("MEDC") an application for financial assistance to facilitate land acquisition, public infrastructure improvements, engineering, permitting, wetland mitigation, and other associated costs in support of the Project (*id.* ¶ 37).  The MEDC is a subdivision of the Michigan Strategic Fund ("MSF"), a Michigan state agency that assists in identifying and promoting opportunities for economic development in the State of Michigan (*id.* ¶ 38).  On October 5, 2022, the MSF approved Gotion's application for a grant of up to $50 million through the Strategic Site Readiness Program ("SSRP"), a program that offers economic assistance for the development of investment-ready sites throughout the State of Michigan and improves the infrastructure in the local community (*id.* ¶ 39).  The MSF also approved an additional $125 million Critical Industry Program ("CIP") grant (*id.* ¶ 40).  With their combined efforts, state and local governments put forward a highly competitive package of $715 million in tax incentives and public grants (Thelen Decl. ¶ 19).

**3.       The Township's December 13, 2022 Support Resolution**

Additionally, on December 13, 2022, the Township pledged its support for Gotion and the Project by unanimously adopting Resolution No. 01-122022 (the "Support Resolution") (Compl. ¶ 42).  In that Resolution, the Township acknowledged that it "strongly supports efforts to bring Gotion Incorporated to our township and community" and declared "that we will make every effort to work in the interests of our constituents and community by assisting Gotion Inc. in their efforts to join our community" (Support Resol. [ECF No. 1-2]).

4.      **Gotion's July 2023 Selection of the Township**

Efforts to recall members of the Township Board because of their support for the Project began in "late 2022" (Compl. ¶ 67).  On June 13, 2023, as a result of the recall efforts, Trustee James Peek resigned (*id.* ¶ 68).  Peek was replaced by Sara Rasmussen (*id.*).

Meanwhile, in July 2023, the efforts of the state and local governments paid off when Gotion chose Michigan—and specifically the Township—as the site for the Project (Thelen Decl. ¶¶ 19–20).  Gotion intends to invest $2.36 billion into the Project, which, once operational, will employ approximately 2,350 individuals (*id.* ¶ 7).  The hourly compensation for these jobs will be around $24.50, almost 150 percent of Mecosta County's average hourly wage of $16.50 (*id.* ¶ 8).  Combined with benefits such as health insurance and paid vacation, the standard employee compensation package projects to be around $60,000 (*id.* ¶ 9).  Gotion anticipates that the Project will bring numerous indirect benefits to Mecosta County and West Michigan, such as significant improvements to local infrastructure and the generation of ancillary businesses to support a growing and more prosperous population (*id.* ¶ 10).  Moreover, Gotion plans to partner with nearby educational institutions to train a new generation of professionals from the local population (*id.* ¶ 11).  Overall, the Project is expected to generate nearly $12 billion in personal income for those directly and indirectly employed by the Project over the next 20 years (*id.* ¶ 12).

5.      **The August 22, 2023 Development Agreement**

The Township Board held a regular meeting on August 1, 2023 (Compl. ¶ 45; Chapman Decl. [ECF No. 17-1] ¶ 6).  At the request of Township Supervisor James Chapman, the public meeting was videotaped (Chapman Decl. ¶ 4).  The Township Board reviewed, at length, the version of a Development Agreement with Gotion that Supervisor Chapman with the Township attorney and representatives of Gotion had negotiated (8/1/23 Video [Att. 1 to Chapman Decl.] at

32:24–55:24). The minutes from the August 1, 2023 Township Board meeting memorialize two pages of discussion points about the Development Agreement, including not only specific terms and conditions but also Gotion's obligations and the Township's obligations under the contract (8/1/23 Twp. Bd. Mins. [ECF No. 13-2 at PageID.262–263]).

Following the review and discussion, Township Attorney Seth Koches indicated that Supervisor Chapman had "well summarized" the Development Agreement and advised the Township Board that it had discretion to authorize Supervisor Chapman to finalize and execute the Agreement—

> We just have that one last provision regarding the escrow fee [Section 2] … to figure out . . . and . . . we're close to working that out. So if the board wants to authorize the Supervisor to finish negotiating that provision and execute this, it's certainly within the board's discretion to do that.

(8/1/23 Video at 55:24–55:44). Pursuant to attorney Koches' advice, Supervisor Chapman asked the Board to authorize him to finalize and approve the Development Agreement:

> [W]hat I'm asking for is first off, permission to complete that negotiation on terms and conditions, section 2, and to, um, approve this[.] You guys understand this is like a union negotiation, okay? Where Mr. Thelen, himself, his team, our team . . . we would pencil an agreement, and that's what you have here, and then, um, it requires a motion of the board, the same as it would do going to the union and asking for approval of the contract and at the same time, Chuck Thelen has to take it back to his board for approval[.] And so, the next thing is, the ball is in our court; do we want to approve this?

(*id.* at 57:44–58:49). A Board member asked whether the agreement could be modified later, "if something comes up" (*id.* at 59:00), to which attorney Koches replied, "you can modify it, but it would require consent of both parties" (*id.* at 59:05). Supervisor Chapman observed "I can't count the number of drafts this thing has gone through" (*id.* at 59:29–59:33). He then called for a vote, and the Board members unanimously voted in favor of the motion (*id.* at 1:00:38–1:00:55). The minutes indicate that a motion was made, supported and unanimously carried to "approve the first

draft of the Development Agreement Gotion Inc. and further to authorize the Supervisor to finish the terms conditions and reimbursement fees" (8/1/23 Twp. Bd. Mins. [ECF No. 13-2 at PageID.262–263]).

Supervisor Chapman indicates that on August 22, 2023, at the direction of the Board, he finalized and executed the Development Agreement (Chapman Decl. ¶ 8).  Chapman's signature was attested by Township Clerk Janet Clark, who also signed the Development Agreement (Dev. Agmt. [ECF No. 1-1 at PageID.31]).  In relevant part, the Development Agreement delineates the following four obligations of the Township:

(a) Diligently review plans and specifications for the Project, as applicable, following Gotion's submission, to ensure they comply with applicable Township ordinances; and

(b) to the extent necessary, coordinate with Mecosta County Road Commission and Mecosta County Drain Commission with respect to any of the public infrastructure improvements contemplated under the SSRP Agreement; and

(c) assist Gotion, to the extent legally permissible, in obtaining or causing to obtain any licenses, permits, or other governmental authorizations necessary to advance the Project and conduct business to support the Project, for which the failure to obtain such licenses, permits, or other governmental authorizations is reasonably likely to materially and adversely affect the Project (financially or otherwise), or impair Gotion's ability to perform its obligations under this Agreement; and

(d) execute necessary easement documents to provide access to the Property for any public infrastructure improvements contemplated under the SSRP Agreement[.]

(*id.* § 4 (GCT's Obligations)).  The Development Agreement provides that "any material failure by either Party to comply with any of the terms, covenants and conditions" of the Agreement constitutes an "event of default" (*id.* § 7.b).  Should an event of default occur, the Development Agreement provides that "the nonbreaching Party may immediately, after the expiration of any applicable Cure Period without a cure . . . exercise an[y] other available remedy at law or equity"

(*id.* § 7.g.a).  The "Cure Period" is defined as the sixty-day period after the non-breaching party provides written notice of the breach to the breaching party (*id.*).

In August 2023, Gotion invested approximately $24,000,000 into the Project to acquire nearly 270 acres of land in the Township, the majority of which is zoned for industrial use (Compl. ¶ 24).

On or about September 13, 2023, Trustee Gary Todd resigned from the Township Board (Compl. ¶ 68; 9/12/23 Twp. Bd. Mins. [ECF No. 13-2 at PageID.269]).  Todd was replaced by Daniel Hoeh (Compl. ¶ 68).

## 6.       The September 15, 2023 Grant Agreement

On September 15, 2023, Gotion and the MSF executed a Grant Agreement, which defines the terms and conditions for the disbursement of SSRP and CIP grant funds (Compl. ¶ 43).  The Grant Agreement requires Gotion and the Township to enter into a separate agreement to provide for the completion of the public infrastructure improvements and site development in the Township necessary for the continuing viability of the Project (Grant Agmt. [ECF No. 1-3]).  The Grant Agreement additionally provides that the Township's failure to substantially perform obligations regarding the improvement of public infrastructure under the separate agreement between Gotion and the Township could constitute breach of the Grant Agreement (*id.* § 5.1(h); *see also id.* at Ex. A (Defined Terms) ¶ (q)).  In the event of default under the Grant Agreement, the MSF may, among other remedies, suspend grant disbursements, terminate the Agreement, or place a freeze on Project funds (*id.* §§ 5.2, 5.3).

## 7.       The October 10, 2023 Resolution No. 1012023

Gotion VP Thelen attests that water infrastructure is a critical part of the Project's success, particularly in the Project's nascent stages, with a possible need of up to 715,000 gallons per day

in the initial phases of operation (Thelen Decl. ¶ 24).  Because of the sizeable water needs of the Project, Gotion must obtain water from a source with sufficient capacity to effectively service the Project (*id.* ¶ 25).  Gotion determined that the most feasible water source was the City of Big Rapids ("the City") (*id.* ¶ 26).

Pursuant to long-term agreements with the City, the Township has limited review-and-approval rights over proposed extensions of the City's water system (Compl. ¶ 54).  Specifically, in May 2000, the Township adopted Ordinance No. 16-52000, which granted the City the right to "construct, install, maintain, operate, repair, replace, and remove" the City's water system "on, along, across and under" the public rights-of-way in the Township "for a Period of Thirty Years" (Ord. No. 16-52000 [ECF No. 1-4]).  Under Ordinance No. 16-52000, proposed extensions of the City's water system through the Township are "subject to the review and approval of the Township," but the scope of that review and approval process is "limited to the impact such extensions may have on the orderly development of the Township consistent with the Township Master Plan" (*id.* § 9).

In July 2000, after the adoption of Ordinance No. 16-52000, the Township and the City executed the Retail Water Service Agreement ("Water Agreement"), which further defines the City's right to construct, install, maintain, operate, repair, replace, and remove the various components of its water system in the Township (Water Agmt. [ECF No. 1-5]).  The Water Agreement provides that individuals and businesses that wish to connect to the City's water system must submit a request for connection to the Township, which in turn submits service requests to the City (*id.* § 7).  Under the terms of the Water Agreement, the Township has the initial obligation to review plans and specifications to determine whether they are consistent with the Township's

Master Plan, but the City has "the sole authority for accepting or rejecting the request of the Township for service" (*id.*).

In accordance with Ordinance 16-52000, Gotion submitted to the Township two sets of alternative plans and specifications to extend the City's water system to service the Project (Thelen Decl. ¶ 30).  Option A would involve extending a new water main from the City's current system to Gotion's property and constructing a water tower (Option A Plans & Specs. [ECF No. 1-6]).  Option B would involve constructing a new city well and water plant directly on or near Gotion's property (Option B Plans & Specs. [ECF No. 1-7]).

After reviewing both Options proposed by Gotion, Big Rapids Mayor Fred Guenther sent a letter to the Township "seeking Green Charter Township's approval of the plans and specifications for both options A and B so as not to require the City to come back later if one or the other option proves unfeasible" (Compl. ¶ 61).  In that letter, the Mayor noted that "[i]n the City's view, neither option will have any adverse impact on future development in the Township inconsistent with the Township's Master Plan. Therefore, based on the limited scope of the Township's review, it is our hope that this review and approval process will not be controversial" (*id.* ¶ 62).

Consistent with its obligation under the August 22, 2023 Development Agreement to obtain the necessary governmental authority necessary to advance the Project, the Township unanimously adopted Resolution No. 1012023 on October 10, 2023, approving Gotion's plans and specifications (the "Water Extension Resolution") (Water Ext. Res. [ECF No. 1-8]).  In the Water Extension Resolution, the Township expressly acknowledged that, in accordance with Ordinance 16-52000, its "review and approval in these circumstances is limited to the impact, if any, such extension may have on the orderly development of the Township consistent with the Township

Master Plan" (ECF No. 1-8 at PageID.122).  The Water Extension Resolution further stated that the "Township Board hereby approves both sets of plans and specifications for the proposed extensions of the Water System as shown in Attachments A and B hereto, with the understanding that the City may select, at its sole discretion, the option that is most feasible and convenient based on the circumstances and results of its efforts to obtain other required outside approvals" (*id.*). Last, the Water Extension Resolution noted that "[t]he Township Board, in approving the plans and specifications, finds and determines that neither of the two alternative proposed extensions of the Water System will adversely impact the orderly development of the Township consistent with the Township's Master Plan" (*id.*).  Gotion represents that since October 2023, it has invested nearly $500,000 in additional costs for management and marketing fees, among other investments (Compl. ¶ 25).

**8.    The November 2023 Recall Election & Rescission of the Water Extension Resolution**

On November 7, 2023, the Township held an election to recall the other five members of the Board who supported the Project (*id.* ¶ 69).  All five remaining members, including Supervisor Chapman, the clerk, treasurer, and two trustees were recalled (*id.* ¶ 70).  The five new members of the Board are Jason Kruse (Supervisor), Corri Riebow (Clerk), Robert Henderson (Treasurer), Jeff Thorne (Trustee), and Kelly Cushway (Trustee) (*id.*).  According to Gotion, all five new members of the current Township Board have publicly expressed anti-Gotion sentiment (*id.* ¶ 72). Supervisor Kruse, the founder and former president of the Mecosta Environmental & Security Alliance ("MESA"), an organization that "exists to fund the legal efforts to stop the construction of" the Project, allegedly indicated that he was "elected to be a no-Gotion guy" and opined that "[t]here's a lot of holes that can be pulled apart and we can dissect this project" (*id.* ¶¶ 74–76). Trustee Thorne allegedly similarly told media that he ran for the Board to "be in th[e] fight" against

the Project (*id.* ¶ 77).  And Trustee Cushway allegedly informed reporters that "[n]othing would make me happier than for Gotion to pull out" (*id.* ¶ 78).

Just one week after their election, at their first meeting on November 14, 2023, the newly comprised Township Board adopted Resolution No. 2023.01 (the "Resolution to Rescind") in a 4-to-3 vote, rescinding the Water Extension Resolution, which had been unanimously adopted only one month earlier (Res. to Rescind [ECF No. 1-9]).  The Township justified its reversal on the grounds that the "current elected board has not had sufficient time and legal expertise to review the [Water Extension] Resolution and agreement terms" (*id.*).  The Township also claimed that the "current board has not had any contact with the City to fully understand the details and or scope of the project," and that it had "NOT reviewed the two alternative sets of plans and specifications for the proposed extension of the Water System" (*id.*).  At the Township's next meeting—a special meeting held on Sunday, December 3, 2023—the Township Board voted 5-to-2 to also rescind the Township's December 13, 2022 Support Resolution (12/3/23 Twp. Bd. Mins. [ECF No. 1-10]).

On November 22, 2023, Gotion made a payment of $75,000 to the Township pursuant to § 2 of the Development Agreement, the provision requiring Gotion to reimburse the Township for certain administrative and professional services costs for the Project.  *See* Dev. Agmt. § 2; Email, ECF No. 17-2 at PageID.309.

9.     **The Notices**

On December 8, 2023, Gotion, through its counsel, notified the Township that it was in material breach of the Development Agreement (Breach Ltr. [ECF No. 1-11]).  Gotion requested that the Township cure its breaches by rescinding the recently adopted resolutions and reinstating the Water Extension Resolution and the Support Resolution (*id.*).

11

On February 8, 2024, the Township sent a letter, denying that any support existed for an alleged breach of the Development Agreement (Twp. Resp. Ltr. [ECF No. 1-12]).  Though the letter's author, attorney Koches, "presumed that the Development Agreement is a binding and enforceable agreement on the parties," he added that "that presumption should not be construed as an admission by the Township that the Development Agreement is binding and enforceable" (*id.*).

At another special meeting on February 21, 2024, the Board adopted an ordinance to establish a Township Planning Commission with the ultimate goal of enacting independent zoning ordinances (2/21/24 Twp. Bd. Mins. [ECF No. 1-13]; Ordinance No. 01-2024 [ECF No. 13-2]).  Gotion alleges that the Township Board indicated that it intends to appoint a 7-person planning commission to create township zoning, rezone Gotion's property, and reject all building permits (Compl. ¶ 105).

On March 7, 2024, the Township served a Notice of Preliminary and Permanent Injunction on the Mecosta County Planning Commission (Not. of Inj. [ECF No. 1-14]).  In the Notice, the Township threatened a lawsuit against the County if the County did not stop processing Gotion's site plan and special use permit application, which had been submitted to the County on March 1, 2024 (Compl. ¶ 107).  The Mecosta County Planning Commission is currently the sole body with zoning jurisdiction with respect to Gotion's site plan and special use permit application (*id.*).

**B.  Procedural Posture**

On March 15, 2024, Gotion initiated this action with the filing of a Complaint, alleging "Breach of Development Agreement" as its sole claim and seeking declaratory and injunctive relief (ECF No. 1).  Gotion alleges that specific performance is an appropriate remedy for the Township's continued refusal to honor its obligations under the Development Agreement, breaches that threaten to undermine the Project and unravel an endeavor "years and millions of

dollars in the making" (*id.* ¶¶ 109 & 117).  Gotion accompanied its Complaint with the motion at

bar (ECF No. 2), seeking a Preliminary Injunction directing the Township to "comply with its

obligations under the Development Agreement," including "assisting Gotion in obtaining or

causing to obtain governmental authorizations necessary to advance the Project" (*id.* at

PageID.148).

Gotion indicates that on March 21, 2024, it made another payment to the Township

pursuant to § 2 of the Development Agreement:  a one-time $25,000 payment for additional

administrative and professional services costs for the Project.  *See* Dev. Agmt. § 2; Email, ECF

No. 17-3 at PageID.312.  On April 12, 2024, the Township filed its Response in opposition to

Gotion's Motion for a Preliminary Injunction (ECF No. 13), arguing in pertinent part that the

Development Agreement was "structurally unenforceable" (*id.* at PageID.243).  Gotion indicates

that that same day, it made a $160,000 payment to the Township to support the upfront costs of

training and equipment for first responders.  *See* Dev. Agmt. § 3.b; Email, ECF No. 17-3 at

PageID.312.  On April 26, 2024, Gotion filed a Reply to the Township's Response (ECF No. 17).

Having considered Gotion's Complaint and attached exhibits, and the parties' motion

briefing and additional exhibits, the Court determines that an evidentiary hearing on Gotion's

Motion for a Preliminary Injunction is not necessary inasmuch as the motion turns on the legal

import of the events in this case, rather than any meaningful dispute about the events themselves.

The Court of Appeals for the Sixth Circuit has held that its "Rule 65 jurisprudence indicates that a

hearing is only required when there are disputed factual issues, and not when the issues are

primarily questions of law." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*

511 F.3d 535, 552–53 (6th Cir. 2007).  *See also S.E.C. v. G. Weeks Sec., Inc.,* 678 F.2d 649, 651

(6th Cir. 1982) (upholding the issuance of an injunction without a hearing because the district court

"had before it adequate documentary evidence upon which to base an informed, albeit preliminary, conclusion" that the plaintiff would prevail on the merits).  In its discretion, *see* W.D. Mich. LCivR 7.2(d), the Court also dispenses with oral argument.

## II.  ANALYSIS

### A.  Motion Standard

In a diversity case, the court applies state law to the merits of a claim, and federal law defines the court's power to issue a preliminary injunction.  *Certified Restoration*, 511 F.3d at 541; *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 382 (6th Cir. 2023).

Federal Rule of Civil Procedure 65 provides that a court "may issue a preliminary injunction only on notice to the adverse party." FED. R. CIV. P. 65(a)(1).  In evaluating a request for a preliminary injunction, a district court should consider: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024); *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023) (citing *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc)).  The four considerations are factors to be balanced and not prerequisites that must be satisfied.  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).  The party seeking the preliminary injunction bears the burden of justifying such relief.   *Id.*  Rule 65(d) requires that "[e]very order granting an injunction must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail ... the act or acts restrained or required." FED. R. CIV. P. 65(d).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, "the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Id.  See, e.g., Brown v. Int'l Bhd. of Elec. Workers, Loc. Union No. 58 AFL-CIO*, 936 F.2d 251, 255–56 (6th Cir. 1991) (rejecting the argument that the district court's findings in connection with a motion for preliminary injunction resolved the disputed issue of fact, even if the district court subsequently makes the same findings at trial).

## B.   Conclusions of Law

### 1.   Likelihood of Success on the Merits

Gotion argues that it is likely to succeed on the merits of its breach of contract claim because the Development Agreement constitutes a valid and binding contract, which the Township breached by rescinding the Water Extension Resolution and the Support Resolution, in violation of its legal obligation under the Development Agreement to assist Gotion in obtaining or causing to obtain governmental authorization to advance the Project (ECF No. 3 at PageID.167–171).

In response, the Township first argues that the Development Agreement was not properly executed and is therefore not enforceable because "the parties as reflected by the contract were not competent to contract and there was no mutuality of agreement" where the Board merely authorized the Supervisor to "finish terms of the proposed Development Agreement, not to execute it" (ECF No. 13-1 at PageID.243–244).  Second, the Township briefly argues that the Development Agreement contains "illusory promises" and is therefore not supported by consideration because

15

"the Development Agreement imposes requirements for the Township to assist Gotion with governmental permits or approval [but] the Township has no input or influence over Gotion's permit application approvals" (*id.* at PageID.244–245). Third, the Township argues that the relief Gotion seeks would (a) impermissibly "trespass" upon the legislative authority of the Township to create a planning commission and enact a zoning ordinance, and (b) violate the Michigan Constitution by essentially making an "irrevocable" franchise agreement, which requires approval by the electorate (*id.* at PageID.245–250, citing MICH. CONST. Art. 7, § 19 (Township public utility franchises)). The Township opines that neither Gotion nor the previous Township Board can "usurp" or "contract away" the Township's legislative authority (*id.* at PageID.245, 247).

The first factor weighs in favor of Gotion.

The parties do not disagree that Michigan law applies to the merits of Gotion's breach-of-contract claim. *See also* Dev. Agmt. § 14 (identifying Michigan law as the "governing law"). Under Michigan law, the essentials of a valid contract are "(1) "parties competent to contract, (2) a proper subject-matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Solomon v. CARite Corp. LLC*, 837 F. App'x 355, 361 (6th Cir. 2020) (quoting *AFT Michigan v. State of Michigan*, 866 N.W.2d 782, 804 (Mich. 2015) (quoting *Detroit Tr. Co. v. Struggles*, 286 N.W. 844, 846 (Mich. 1939)). As Gotion points out in reply (ECF No. 17 at PageID.290), the Township does not dispute that if the Development Agreement is enforceable, then the Township's actions constitute a breach of that Agreement. The Township's challenge to the validity of the Development Agreement turns primarily on the first element: whether the Development Agreement was executed by competent parties, specifically, whether then-Supervisor Chapman was authorized to both finalize and execute the Development Agreement.

Michigan's Constitution provides that a township "shall be a body corporate with powers and immunities provided by law." MICH. CONST. Art. 7, § 17.  *Cf. Huxtable v. Bd. of Trustees of Charter Twp. of Meridian*, 302 N.W.2d 282, 283 (Mich. Ct. App. 1981) (observing that the constitutional provision, which references "organized townships," does not distinguish between charter and general-law townships).  *See also Hess v. Cannon Twp.*, 696 N.W.2d 742, 747 (Mich. Ct. App. 2005) (recognizing that townships have no inherent powers, only the powers conferred on them by the Legislature or the Michigan Constitution) (citing *Howell Twp. v. Rooto Corp.*, 670 N.W.2d 713, 716 (Mich. Ct. App. 2003)).  Michigan's Constitution additionally provides that "[t]he provisions of this constitution and law concerning … townships … shall be liberally construed in their favor." MICH. CONST. Art. 7, § 34.

Michigan law permits a township having 2,000 or more residents to incorporate as a "charter township." MICH. COMP. LAWS § 42.1(2).  A charter township is governed by an elected board of trustees, which is vested with "[a]ll legislative authority and powers." *Id.* § 42.5(1).  Charter townships and general-law townships possess the same powers, privileges, immunities, and liabilities. MICH. COMP. LAWS § 42.1(2); MICH. COMP. LAWS § 42.5(2).

In specifying the powers of a township, the Michigan Legislature expressly included the power to "make contracts" when necessary and convenient for the exercise of the township's corporate powers. MICH. COMP. LAWS § 41.2(1)(b).  Additionally, the Michigan Legislature identified the supervisor of each township as "the agent for his or her township for the transaction of legal business[.]" MICH. COMP. LAWS § 41.2(4).  *See also* MICH. COMP. LAWS § 42.10(o) (providing that unless delegated to a township superintendent, the supervisor of a charter township shall exercise the power and duties that "may be … required of him … by direction of the township board"). *See, e.g., Webb v. Wakefield Twp.*, 215 N.W. 43, 45–46 (Mich. 1927) (holding that the

17

contract entered into by a township supervisor, despite the failure to observe certain procedures and limitations, bound the township); *Harbor Watch Condo. Ass'n v. Emmet Cnty. Treasurer*, 863 N.W.2d 745, 749–50 (Mich. Ct. App. 2014) (indicating that the "controlling fact" in *Webb* was that "although formalities had not been followed, performance was within the defendant's legal authority").

Two older cases of the Michigan Supreme Court are helpful in analyzing the Township's first argument.  In *McGaughan v. West Bloomfield Township*, 256 N.W. 545, 547 (Mich. 1934), the Michigan Supreme Court held that an employment contract entered into by a township supervisor with the plaintiffs-surveyors, despite the failure to properly record the official action in the township records, bound the township.  The Michigan Supreme Court held that "[c]onvincing testimony of those who at the time were members of the township board establishes beyond question that in fact the board did by proper action authorize the supervisor to have this survey made, and the supervisor so informed plaintiffs at the time he employed them."  *Id.*

Similarly, in *American La France & Foamite Indus. v. Village of Clifford*, 255 N.W. 596, 598 (Mich. 1934), the Village of Clifford entered into a contract for a fire engine, which it retained, but then argued that it was "not bound by the contract because the action of the council was not evidenced by a yea and nay vote or recorded as such."  The Michigan Supreme Court rejected the argument as "without merit," holding that the record fully sustained the plaintiff's contention that the purchase of the engine was approved by the requisite vote of the members of the council.  *Id.* The Michigan Supreme Court inferred from the record evidence that the vote had been taken by "a showing of hands rather than by the verbal expression of yea and nay."  *Id.*  The Court noted that even if the action of the village council was not taken and recorded in strict compliance with the statutory provisions, the village should not be permitted to escape its obligations on a "technical

18

pretext." *Id. See also Parker v. W. Bloomfield Twp.*, 231 N.W.2d 424, 428 (Mich. Ct. App. 1975) ("The municipality is bound by its dealings even if that power had been exercised in an irregular fashion[.]").

The Township's first argument in this case, that then-Supervisor Chapman was not authorized to both finalize and execute the Development Agreement, is likewise not supported by the current record. Like the evidence that bound the townships in *McGaughan* and *American La France*, the evidence in this case, viewed in totality, binds the Township. Specifically, (1) the Board's August 1 meeting minutes, (2) the Board's official video recording of that public meeting, (3) Supervisor Chapman's own Declaration, and even (4) the advice of the Township attorney at the August 1 meeting (that the Township Board had the discretion to authorize Supervisor Chapman to both finalize and execute the Agreement and that any subsequent modifications to the executed contract would necessarily require the consent of both parties) together demonstrate that the Township Board authorized Supervisor Chapman to not only finalize but also execute the Development Agreement with Gotion. Informed by this evidence, the Court's preliminary, legal conclusion is that the Township Board imbued Supervisor Chapman with the authority to ratify a finalized version of the contract. Additionally, consistent with the execution of the Development Agreement, the Township subsequently reviewed and approved both proposals for water infrastructure for the Project, and Gotion made payments to the Township required by the Development Agreement. In short, the Township's first argument—that the Development Agreement was not executed by competent parties—fails at this stage in the litigation.

The Township's second argument, its challenge to the consideration for the contract, fares no better. The Township argues that its illusory promises render the Development Agreement unenforceable. Under Michigan law, "an illusory promise is one where the promisor is 'not

19

obligated to do anything in consideration of' the other party's promise or performance." *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp. 2d 888, 921 (W.D. Mich. 2008) (quoting *J & B Sausage Co. v. Dep't of Mgmt. & Budget*, 2007 WL 28409, at *3, n.1 (Mich. Ct. App. Jan. 4, 2007) (citing RESTATEMENT SECOND OF CONTRACTS § 77, comment a, p. 195)).  As delineated *supra*, the Development Agreement does not contain illusory promises but obligates the Township to four specific tasks in consideration of Gotion's promises and performance: to diligently review plans and specifications for the Project; coordinate with Mecosta County with respect to any of the contemplated public infrastructure improvements; assist Gotion in obtaining or causing to obtain any licenses, permits, or other governmental authorizations necessary to advance the Project and conduct business to support the Project; and execute necessary easement documents to provide access to the Property for the public infrastructure improvements (Dev. Agmt. § 4 (GCT's Obligations)).  Gotion aptly opines that "[t]he actions that prompted this lawsuit exemplify the significance of the Township's obligations" relative to Gotion's permit application approvals (ECF No. 17 at PageID.295).

Last, the Township's appeal to legislative and constitutional concerns is misplaced.  First, as Gotion indicates in its Reply (ECF No. 17 at PageID.296), Gotion is not disputing the Township's right to self-zone.  This Court can, without affecting the Township's ability to enact its own zoning ordinance, direct the Township to return to the status quo and comply with its contractual obligations.  Second, the October 2023 Water Extension Resolution, which was adopted in accordance with the May 2000 Ordinance No. 16-52000, does not implicate the provision of Michigan's Constitution prohibiting a township from granting a public utility an irrevocable franchise.  Rather, Ordinance No. 16-52000 expressly states that it is "revocable at the will of the Township" (Ord. No. 16-52000 § 2, ECF No. 1-4 at PageID.93).

20

In sum, the Court concludes that the first factor—Gotion's likelihood of success on the merits of its breach-of-contract claim—weighs in Gotion's favor.

## 2.     Whether Plaintiff Will Suffer Irreparable Injury without a Preliminary Injunction

Gotion argues that absent immediate injunctive relief, it will suffer irreparable injury in the form of damages in the millions of dollars and years of additional delay of a critical aspect of the Project that will inevitably cause delays of other, equally critical aspects of the Project in a "devastating domino effect" (ECF No. 3 at PageID.171–175).   Gotion points out that its injury, which involves the prevention of the use and enjoyment of unique real property, is not fully compensable by money damages and that the money damages would, in any event, far exceed the Township's ability to pay (*id.* at PageID.176–178).   Gotion indicates, for example, that it has already invested over $24 million into the Project by way of real estate acquisition costs and other related fees (*id.* at PageID.176, citing Thelan Decl. ¶ 14).

In response, the Township argues that Gotion's claim of irreparable harm is "speculative" and not "ripe" because Gotion has not received any approvals of its special land use application and site plan and is therefore not yet permitted to construct the Project (ECF No. 13-1 at PageID.250–253).

The second factor also weighs in favor of Gotion.

The irreparable-injury factor is "indispensable."  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).  If a plaintiff is not facing imminent and irreparable injury, then there is no need for a court to grant relief at the start of a lawsuit, as opposed to at the end of the lawsuit.  *Id.* A plaintiff seeking injunctive relief must show that irreparable injury is not merely "possible" but that it is "likely," absent an injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The Sixth Circuit has held that a party's injury is "irreparable" when its losses are

"unrecoverable," *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); the injury is "not fully compensable by money damages," *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't.*, 305 F.3d 566, 578 (6th Cir. 2002); and when the nature of the loss would make damages "difficult to calculate," such as "competitive losses and losses of customer goodwill," *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

The current record more than amply supports a showing of irreparable harm to Gotion absent injunctive relief.  The significant monetary and contractual harms Gotion would suffer if the Project, an extensive undertaking with coordinated construction processes, were to continue to be delayed qualify as irreparable injury under Sixth Circuit precedent.  In particular, Gotion has indicated that without assurance that it can obtain the water infrastructure that is critical for the Project, "the Project has been delayed and continues to be delayed with each passing day" (ECF No. 17 at PageID.301), i.e., a harm that cannot wait for an award of injunctive relief at the end of this case.

The Township's ripeness argument does not compel a different conclusion.  As Gotion points out in reply (ECF No. 17 at PageID.301), the Township has misconstrued how the doctrine of ripeness applies to Gotion's breach-of-contract claim.  "A claim is unripe when 'it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all.'"  *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp., Michigan*, 82 F.4th 442, 448 (6th Cir. 2023) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Here, Gotion alleges that the Township's "actions following the November recall election, including rescinding the Water Extension Resolution and the Support Resolution," breached § 4(c) of the Development Agreement (Compl. ¶¶ 114–116).  In other words, the alleged breach—the Township's failure to assist Gotion—has already happened, and is not "speculative" and does not "rest[] upon contingent future events."

*See, e.g., Wal-Mart Real Est. Bus. Tr. v. Eastwood, LLC*, No. 1:13-cv-1348, 2015 WL 12910670, at *4 (W.D. Mich. July 27, 2015) (holding that where Wal-Mart asserted that Eastwood had breached lease documents by failing to cooperate with Wal-Mart's efforts to obtain the permits necessary for an expansion, "the alleged breach—Eastwood's failure to cooperate—ha[d] already happened, and [was] not speculative, hypothetical, or possibly occurring in the future").  Whether Gotion receives approvals of its special land use application and site plan and constructs the Project is irrelevant to its breach-of-contract claim and concomitantly irrelevant to the alleged injury for which Gotion seeks preliminary injunctive relief.

**3.     Whether Issuance of a Preliminary Injunction Would Cause Substantial Harm to Others**

Gotion argues that the balance of equities strongly favors Gotion because the Township has failed to identify a single harm or hardship it will suffer if it complies with its obligations under the Development Agreement (ECF No. 3 at PageID.178–179).  In response, the Township merely reiterates that it will be substantially and "unconscionably" harmed if its legislative authority is usurped and "illegal contract zoning" is permitted, rendering Michigan zoning laws "completely nugatory" (ECF No. 13-1 at PageID.253).  Consequently, for the reasons previously stated, this factor also weighs in favor of Gotion.

**4.     Whether the Public Interest Would Be Served by Issuance of a Preliminary Injunction**

Last, Gotion opines that the Township's obstructive conduct hinders public interest considerations at almost every governmental level:  local, state, and federal (ECF No. 3 at PageID.179–180).  In response, the Township argues that the granting of an injunction against the Township would lead "directly to public harm" because the Township Board is "seeking to address the concerns of the voters and have the opportunity to provide meaningful input on this massive

23

Project by enacting a zoning ordinance as authorized by law" (ECF No. 13-1 at PageID.253–254). This last factor weighs in favor of Gotion.  The Sixth Circuit has held that "[e]nforcement of contractual duties is in the public interest."  *Certified Restoration*, 511 F.3d at 551 (holding that issuing the requested preliminary injunction "would hold Defendants to the terms of the bargain they entered into through the franchise agreement").  As the Michigan Supreme Court has opined, "[t]he good faith of government should never be held less sacred than that of individuals."  *Hatch v. Maple Val. Twp. Unit Sch.*, 17 N.W.2d 735, 740 (Mich. 1945).

In sum, the Court determines that the balance of the factors weighs in favor of issuing a preliminary injunction directing the Township to comply with its obligations under the Development Agreement, as defined therein, pending resolution of this case or further Order of the Court.  The Court notes that in their written submissions to this Court, neither side identified any purpose that requiring a security under Federal Rule of Civil Procedure 65(c) would serve. The Court therefore waives the security requirement.  *See In re Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("While ... the language of Rule 65(d) appears to be mandatory, and many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction (ECF No. 2) is GRANTED, and a Preliminary Injunction shall issue.


Dated:  May 17, 2024                                      /s/ Jane M. Beckering
                                                         JANE M. BECKERING
                                                         United States District Judge